NO. 07-05-0088-CR


NO. 07-05-0089-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



MAY 10, 2005



______________________________




SHANNON DEWAYNE THOMPSON, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE



_________________________________



FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;



NO. 49,282-B & 49,283-B; HONORABLE JOHN B. BOARD, JUDGE



_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

ABATEMENT AND REMAND


 Pending before this Court is a second request for an extension of time in which to
file a reporter's record in which the official court reporter indicates no designation has been
filed. The supplemental clerk's record contains an order dated June 9, 2004, appointing
attorney Greg Phifer to represent appellant Shannon Dewayne Thompson. The record,
however, reflects that on November 22, 2004, attorney Ronald T. Spriggs was retained to
enter an appearance as attorney of record for appellant. Also in the record is the trial
court's order of April 8, 2005, granting Spriggs's motion to withdraw. To promote judicial
efficiency, we now abate this appeal and remand the cause to the trial court for further
proceedings pursuant to Rule 35.3(c) of the Texas Rules of Appellate Procedure. 

 Upon remand, the trial court shall immediately cause notice of a hearing to be given
and, thereafter, conduct a hearing to determine the following: 

 1. whether appellant desires to prosecute the appeal; and

 2. whether appellant is indigent and entitled to appointed counsel.


The trial court shall cause a hearing to be transcribed. Should it be determined that
appellant does want to continue the appeal and is indigent, then the trial court shall also
take such measures as may be necessary to assure appellant effective assistance of
counsel, which measures may include the appointment of counsel. If counsel is appointed,
the name, address, telephone number, and state bar number of said counsel shall be
included in the order appointing counsel. Finally, the trial court shall execute findings of
fact, conclusions of law, and such orders as the court may enter regarding the
aforementioned issues and cause its findings and conclusions to be included in a
supplemental clerk's record. A supplemental record of the hearing shall also be included
in the appellate record. Finally, the trial court shall file the supplemental clerk's record and
the supplemental reporter's record with the Clerk of this Court by Friday, June 10, 2005.

 The court reporter's request for extension of time is held in abeyance pending the
trial court's findings and conclusions.

 It is so ordered.


 Per Curiam




Do not publish. 



e walls
was because she had a hard time getting it off, 8) Hoover had to move several times due
to eviction notices and the deplorable conditions of the home, including human feces on
the wall, no linens on the children's beds and trash running over in all the rooms, 9) Hoover
was unable to maintain employment, 10) there were attachment issues between Hoover
and the children (i.e. they had not bonded), 11) Hoover had continuing problems with
depression, 12) the children suffered from ringworms, 13) Hoover was diagnosed with self-defeating and depressive personality traits, 14) Hoover's mental traits impaired her
parenting ability and her prognosis for improvement was poor, 15) she, furthermore, had
a dependent personality which prevented her from being able to parent children, 16) out
of the 11 opportunities to visit with M.B., her infant child, Hoover was late for five
appointments and was a "no-show" for six, 17) Hoover, according to her therapist, is a
pathological liar, 18) she continued to stay in an abusive relationship with Lloyd Hoover
(her husband and father of the deceased child) off and on which included the period
wherein she became pregnant with M.B., 19) she depended upon the financial support of
family, 20) Hoover either failed to comply with the CPS service plan developed to get her
children back or marginally completed the assigned tasks, and 21) she could not financially
support her children or provide them a safe and stable environment. 

 Other evidence illustrated that C.G.B. and T.L.B. 1) were diagnosed with behavioral
problems when first placed with their foster parents, 2) these behaviors included
nightmares, eating disorders, fighting, aggression and smearing feces on walls, 3) M.B.
had never lived with Hoover because of the ongoing criminal investigation into the death
of Hoover's third child, 3) C.G.B. and T.L.B. were in need of constant supervision, 4) both
would "run off in parking lots," . . . "were cruel to animals in the home," "avoided being
parented," and "usually responded quite angrily at having consequences," and 5) since
being removed from Hoover, the children were exhibiting about half of the problems they
originally presented.

 In comparing the foregoing litany of evidence against the Holley factors, one could
reasonably form a firm conviction or belief that Hoover lacked the parental ability, skills and
desire as well as the financial ability to raise offspring, that though programs were available
to assist her in improving her personal and parenting skills she did not or could not benefit
from them, that Hoover could not provide a stable home environment for all three children,
and that Hoover's acts or omissions indicated that the existing parent/child relationship was
not a proper one. In short, the evidence entitled a factfinder to reasonably form a firm
conviction or belief that it was in the best interest of each child to terminate the parent/child
relationship.

 Having found that the evidence both legally and factually supports the decision that
termination would be in the children's best interests, we affirm the judgment of the trial
court. 


 Brian Quinn 

 Chief Justice